[813 NYS2d 78]

In the Matter of Samuel Gen, an Attorney, Respondent. Departmental Disciplinary Committee for the First Judicial Department, Petitioner.

First Department, April 20, 2006

## APPEARANCES OF COUNSEL

*Thomas J. Cahill, Chief Counsel, Departmental Disciplinary Committee (Raymond Vallejo* of counsel), for petitioner.

*Michael S. Ross* for respondent.

### OPINION OF THE COURT

Per Curiam.

Respondent Samuel Gen was admitted to the practice of law in the State of New York by the First Judicial Department on October 31, 1994 and, although also admitted to the bar in the State of New Jersey and the District of Columbia, respondent has never engaged in the practice of law.

The Departmental Disciplinary Committee now moves for an order, pursuant to 22 NYCRR 603.4 (d) and 605.15 (e) (2), confirming the findings of fact and conclusions of law set forth in the report of the Hearing Panel, dated June 27, 2005, and imposing upon respondent whatever sanction this Court deems just. Respondent cross-moves for an order imposing a six-month suspension upon respondent.

Respondent was convicted, on June 15, 2004, upon his plea of guilty in the Supreme Court of the State of New York, of attempted grand larceny in the fourth degree (Penal Law §§ 110.00, 155.30 [1]), a class A misdemeanor, and was sentenced to a three-year conditional discharge, ordered to pay a $1,000 fine, and was required to perform 200 hours of community service. This Court, by order entered November 17, 2004, determined that the crime of which respondent was convicted is a serious crime and referred the matter to a Hearing Panel to conduct a hearing and recommend an appropriate sanction. A hearing was subsequently held on January 21, 2005.

The facts herein are not in dispute. Respondent, who graduated law school in 1994, was employed from 1985 through October 1999 by Philip Morris, where he held various non-law-related positions. Respondent thereafter performed computer data entry on a per diem basis at placements arranged by a legal temporary employment agency. In May 2003, respondent submitted a copy of his resume to the Meridian Legal Search agency in furtherance of his search for legal employment. The resume stated, untruthfully, that: as an attorney, he had maintained his own law office from October 1999 to July 2000; he was assigned, as an attorney, to the legal department of Merrill Lynch and had negotiated and drafted certain master credit

agreements; and he had acted as Philip Morris's attorney in negotiating and drafting complex information technology, outsourcing, and equipment contracts.

With regard to the events underlying the matter at bar, in September 2003, respondent's friend, James Meiskin, requested respondent's assistance in obtaining restitution, in exchange for a lenient victim statement, from Shannon Olexa, who had been arrested for the burglary of Meiskin's apartment and the theft of his plasma television. Respondent, on September 24, 2003, left a telephone message with the Olexa family, identifying himself as Meiskin's attorney, and the call was returned by Larry Hochheiser, an attorney hired by the Olexa family. Respondent informed Hochheiser that in exchange for $100,000, Meiskin would provide a favorable victim's statement and a waiver of civil liability. In subsequent phone calls with Hochheiser, which Hochheiser recorded, respondent continued to promote the arrangement and allay Hochheiser's concerns about the need for, and propriety of, the proposed deal.

Hochheiser contacted the New York County District Attorney's office and on October 3, 2003, respondent received a phone call from a man who identified himself as James Powers, a friend of Olexa's stepfather. Powers, in reality, was an undercover detective assigned to the New York County District Attorney's office. Respondent met with Powers on October 9, 2003 and, during the course of that meeting, which was tape recorded, respondent promised that Meiskin's cooperation would include his refusal to testify and his waiver of civil liability which is "where that extra number comes from," in that the payment of $10,000 in restitution would be disclosed to the District Attorney's office, with the remaining $90,000 embedded in a secret, "private" agreement which would not be discussed in order not to "trigger additional procedures in the system." Respondent also added that if the $100,000 were not paid, Meiskin would make unfavorable statements to the prosecutor as well as provide unfavorable testimony and further stated, in substance, that Olexa's family would be taking buses and ferries to visit Olexa in prison for many years and that because Olexa was young, healthy and attractive, he would not do well in prison.

Powers, during an October 10, 2003 telephone conversation, asked that the draft agreement be modified to state that Meiskin "will not cooperate with the D.A., and that he would not testify if he's asked to." Powers also stated that "one of the ways we

could alleviate any problems with this case is that if [Meiskin] refuses to cooperate with the District Attorney," to which respondent answered, "Okay, not a problem." On October 16, 2003, respondent confirmed that Meiskin would refuse to testify, but was reluctant to put that in writing because "[y]ou can't make agreements not to cooperate with the authorities." On October 17, 2003, respondent and Powers met at Powers' office, but respondent insisted the meeting be moved to another location, apparently due to his concern about the presence of secret recording devices. Meiskin then assured Powers that he would not testify against Olexa, at which point Powers asked what would happen if they did not have a deal. Respondent replied that a $250 million civil lawsuit would be filed against Olexa, and Meiskin would proceed with the criminal charges. The written agreement was then executed and two cashiers checks, one for $10,000, the alleged actual damages, and one for $65,000, for full cooperation and favorable testimony, were given to and accepted by Meiskin, whereupon respondent and Meiskin were arrested.

In mitigation, respondent's wife, sister, brother-in-law and uncle all testified to respondent's good reputation for honesty, integrity and truthfulness. Respondent also submitted character letters from his father, a cousin, and a friend who all wrote about the emotional pain and humiliation respondent has suffered. Respondent testified that he only intended to negotiate a legitimate restitution agreement but got "carried away" in his effort to do a good job for a friend, and his inexperience as an attorney impaired his resistance to Powers' proposals. Respondent also noted that he has performed charitable work, did not gain financially from his offense, and has already suffered considerable pain, humiliation and economic hardship.

The Hearing Panel noted that respondent admittedly demanded payments from the family of a burglary suspect "in return for squelching a case, stopping a prosecution, even providing inaccurate testimony, if it came to that." The Hearing Panel concluded that "the mere fact that respondent was not charged with a felony is not in and of itself an aggravating factor, respondent's pursuit of a course of conduct so clearly prejudicial to the administration of justice reflects adversely on his character and fitness to practice law, and in the Panel's view is sufficient cause for disbarment."

The Panel noted that this was not a case in which a practicing attorney makes a single misstep out of character since re-

spondent has never practiced law and the only facts known about his integrity as an attorney are: that in his only representation of a client, he attempted to broker a corrupt agreement involving noncooperation with a prosecutor, to the point of suborning perjury; and that he submitted a fraudulent resume to a legal placement agency which "grossly misrepresented" data-entry jobs as experience in the drafting and negotiation of complex contracts for Fortune 10 companies. The Panel further noted that respondent's offense was not committed on a single aberrant day but, rather, evolved over the course of several weeks and 14 separate communications. The Panel concluded that respondent's inexperience as a lawyer was not a mitigating factor, as he was, at the time in question, a 47-year old holder of three advanced degrees who "was experienced enough to try to sanitize the written version of the improper agreement and to express concern that his verbal commitments were being secretly recorded."

At the conclusion of the hearing, the Committee and respondent submitted proposed reports to the Panel, with recommendations of, respectively, a two-year suspension and a six-month suspension. The Panel, pursuant to a report dated June 27, 2005, recommended that respondent be disbarred, and the Committee now moves for the imposition of whatever sanction this Court deems just and proper, whereas respondent cross-moves for the imposition of a six-month suspension. We agree with the sanction recommended by the Panel and find that respondent should be disbarred.

In determining the appropriate sanction to be imposed, we note that the underlying conviction arises out of an extortionate scheme to obstruct justice by which respondent demanded payment in exchange for possibly perjurious testimony, conduct which strikes at the heart of the proper administration of justice and adversely reflects on his character and fitness to practice law. Respondent demanded the payment of $100,000 to secure his client's refusal to cooperate in the prosecution of a burglary suspect, and to provide favorable testimony if the client's appearance was required. Moreover, respondent threatened that absent payment, his client would testify against the burglary suspect, and that he would seek a lengthy prison term, resulting in profound hardship to the family and the suspect, and would also file a $250 million lawsuit.

With regard to mitigation, respondent, as a nonpracticing attorney, could point to no established record of upholding the

strict ethical standard of the legal profession. Indeed, respondent's two forays into the legal field produced a fictionalized version of his legal experience in a resume, and the underlying, failed attempt to obstruct justice by extorting money in exchange for favorable, and likely perjurious testimony. The foregoing, coupled with an utter lack of any positive legal experiences, evidence a level of dishonesty completely inconsistent with his relatives' stated confidence in his integrity. As a result, we agree with the Panel that the appropriate sanction in this matter is disbarment (*see Matter of Yao*, 250 AD2d 221 [1998]; *Matter of Theoharous*, 183 AD2d 391 [1992]).

Accordingly, the motion should be granted to the extent that the findings of fact and conclusions of law of the Hearing Panel be confirmed, the sanction recommended by the Hearing Panel likewise be confirmed, and respondent be disbarred from the practice of law. Respondent's cross motion should be denied.

MAZZARELLI, J.P., ANDRIAS, FRIEDMAN, SULLIVAN and NARDELLI, JJ., concur.

Respondent disbarred, and his name stricken from the roll of attorneys and counselors-at-law in the State of New York, effective the date hereof. Cross motion denied in its entirety.